**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

BIG E TRAILERS, INC.,

        **Plaintiff,**

v.                                  **Case No:  6:14-cv-1528-Orl-31TBS**

THE OHIO ANDERSONS, INC.,

        **Defendant.**

---

**ORDER**

The Ohio Andersons, Inc. ("TOA") is an agricultural corporation that delivers liquid fertilizer to various farms in Florida, using trailers equipped with large tanks. Big E Trailers, Inc. ("Big E"), among other things, provides maintenance and repair services for tanks and trailers. In 2011, TOA and Big E entered into a contract, requiring Big E to maintain and repair TOA's trailers in exchange for a monthly flat fee. Several years into the contract, relations between the two companies became strained; and in April 2011, TOA refused to continue paying Big E the monthly fee. In August 2014, Big E filed the instant suit, alleging that TOA had improperly terminated, and breached, the contract when it refused to make the required monthly payments. TOA filed a counterclaim, asserting that it properly terminated the contract because Big E failed to perform various contractual obligations. The Court held a bench trial in February 2016. (*See* Trial Tr., Docs. 106, 107).[1] Having thoroughly considered the evidence and argument of counsel, the Court enters its findings of fact and conclusions of law.

---

[1] Volume I of the Transcript (Doc. 106), will be referred to herein as "Tr. 1," and Volume II of the Transcript (Doc. 107), will be referred to as "Tr. 2." In addition, the Court will only cite to documents contained in Defendant's "B" Exhibits List, as Plaintiff's exhibits are merely duplicates of the same information.

# FINDINGS OF FACT[2]

## I.     JURISDICTION

Subject matter jurisdiction is proper pursuant 28 U.S.C. § 1332, as complete diversity of citizenship exists between the parties and the amount in controversy exceeds the jurisdictional threshold.

## II.     THE PARTIES

Big E is a corporation which services the fertilizer industry in Florida by rebuilding, repairing, and maintaining fiberglass tanks and the trailer frames of the bulk haulers which transport the tanks. Big E's repair shop is located in Bartow, Florida. Sylvia Earline Ford ("Ford") is the principle of Big E, Bill Smith ("Smith") is the Shop Supervisor, and Ivy Yong ("Young") is the Office Manager. (Tr. 1 at 25; Tr. 2 at 90). Big E also employees several servicemen.

TOA is an agricultural corporation whose southern region specializes in the delivery and application of liquid fertilizer and other crop production products for various farms. (Tr. 1 at 74–75). The southern region includes four product and distribution facilities in the following Florida locations: Zellwood, Lake Placid, Clewiston, and Immokalee (the "Southern Region"). (*Id.*). The Southern Region's chain of command includes the following individuals: Vice President Joseph Hodges ("Hodges"); General Manager Barney Cherry ("Cherry"); Supervisor David Plank ("Plank"), and Maintenance Supervisor Greg Britt ("Britt"). (*Id.* at 94–95; Tr. 2 at 5).

## III.     TERMS OF THE AGREEMENT

On October 1, 2011, TOA and Big E entered into a four-year Trailer Maintenance Agreement. (*See* Ex. 13 (the "Agreement" or "2011 Agreement")). In broad terms, the Agreement,

---

[2] The following facts are undisputed or have been established by a preponderance of credible evidence. To the extent that any of these facts may represent conclusions of law, the Court adopts them as such.

required Big E to service 107 trailers in TOA's fleet at the Lake Placid and Clewiston facilities (the "Fleet"). (*Id.* at ¶ 1(a); Tr. 158). Specifically, the Agreement provided that:

> Big E shall perform all repair, maintenance, and rebuilding services (excluding tire supply and mounting) (the "Services") that are necessary in order to properly maintain all tanker trailers in the [TOA] Fleet at all times in good operating condition and in compliance with all federal, state, and local laws, rules, regulations or ordinances regulating the operation of such trailers, and to provide all parts and accessories required for the Services, except as otherwise specified herein. . . . Big E shall provide, at its sole cost and expense, all equipment, labor, tools, parts and all other materials and supplies necessary to provide the Services, except as otherwise specified herein. In addition Big E will provide preventative maintenance on the [TOA] Fleet. The Services shall include, but shall not be limited to: mechanical maintenance, repair of tanks, suspension, brakes, air system, landing gear, pump, motor, and lights, performing sandblasting and refurbishing paint applications on the [TOA] Fleet within the Term of this Agreement[.]

(*Id.* at ¶ 1(a)).

The Agreement further provided that "[i]n the exercise and performance of the Services, Big E shall comply with all federal, state, and local laws, ordinances, decrees, orders, regulations, permits or any other requirements having the force of law." (*Id.* at ¶ 7). In exchange for Big E's Services, TOA agreed to pay Big E a monthly fee of three hundred and twenty-five dollars ($325.00), multiplied by the number of trailers in the Fleet. (*Id.* at ¶ 2). To facilitate Big E's performance under the Agreement, TOA also agreed to lease its Lake Placid repair shop to Big E. (*Id.* at 1(a); Tr. 1 at 65).

The Agreement had an effective date of October 1, 2011, and ran for a continuous period of four years before expiring on September 30, 2011. (*Id.* ¶ 3). However, in the "event of default," the non-defaulting party could exercise its right to terminate the Agreement. (*Id.* ¶ 9). The Agreement provided, in pertinent part, that an "event of default" would occur if:

> (a) [TOA] fails to make full and timely payment pursuant to this Agreement; . . . or, (d) Big E has failed to perform any obligation imposed hereunder, including but not limited to the Services, or has failed in any respect to provide the Services with promptness, diligence, skill, or in a good and workmanlike manner commensurate with the standard for the tanker trailer maintenance and repair industry, or with applicable laws.

(*Id.* at ¶ 8(a) & (d)). In addition, TOA had the immediate right to terminate the Agreement for cause if Big E failed to perform any obligations specified in the Agreement, or failed "to perform any of the Services in a manner consistent with the Agreement or reasonably prudent industry standards." (*Id.* at ¶ 24).

The 2011 Agreement does not express the frequency or manner in which Big E was obligated to perform its Services. However, some of these details were elicited during trial. According to the trial record, Big E performed minor repairs in Lake Placid, and major repairs in Bartow.  (*Id.* at 66). Big E performed repairs to the trailers in the Fleet if (1) TOA brought a red-tagged[3] trailer to the Bartow facility, (Tr. 1 at 159 Doc. 92-2 at 55:19–25); (2) TOA faxed, emailed, or verbally notified Big E of a problem with a trailer, (92-2 at 53, 55); or (3) Big E discovered a problem while servicing a trailer, (Tr. 2 at 145, 169).

To avoid placing "strain" on TOA's business, TOA brought each trailer to Big E during a specific time interval, and Big E performed annual inspections on a rotating basis. (Tr. 2 at 25, 169; Doc. 92-1 at 51:22–25). Periodically, TOA also brought trailers to Big E so that it could provide preventative maintenance. (Doc. 92-1 at 50:6–51:21). However, the TOA's trailers were not always accessible to Big E; consequently, several months could pass before Big E had the opportunity to service each trailer. (Tr. 2. at 169).

---

[3] "Red-tagging" is a term used to describe the act of placing a red tag on a trailer with a brief description of the problems it is experiencing. (Tr. 1 at 159). If a trailer is "red-tagged" it cannot be placed back in service until a mechanic repairs it. (*Id.* at 127).

## IV.     DEVELOPMENT OF THE DISPUTE

In 2007, Big E and TOA entered into their first maintenance agreement. (*See* Ex. 1 (the "2007 Agreement")). The 2007 Agreement was substantially the same as the 2011 Agreement, but differed in one material respect—it required that Big E remove plastic tanks from sixty-three trailers owned by TOA and replace them with fiberglass tanks. (*Id.* at 001-002). In accordance with the 2007 Agreement, Big E spent several years converting the trailers by replacing the plastic tanks with fiberglass tanks. (Ex. 20, 20-002–005). During the conversion process, Big E unilaterally decided to remove or modify crossmembers on some, but not all, of the trailers so that the fiberglass tanks would fit (the "CM Modifications").[4] (Tr. 1 at 39–40). After Big E successfully installed the fiberglass tanks, TOA accepted the trailers (some of which had the accompanying CM Modifications). The 2007 Agreement expired on October 1, 2011, (*id.* at 79), and the 2011 Agreement took effect soon thereafter, (*id.* at 28).[5]

Several years into the 2011 Agreement, Britt began to raise concerns with TOA management regarding the structural integrity of trailers with the CM Modifications. (*Id.* at 145–146; Tr. 2 at 6– 7). Due to Britt's concerns, TOA spent time inspecting trailers with the CM Modifications from July 2013 through December 2013. (Tr. 1 at 146). During this period, TOA

---

[4] The Court uses the term "CM Modifications" to refer to the modifications Big E made to the crossmembers of TOA's trailers under the 2007 Agreement.

[5] The Court summarizes facts related the 2007 Agreement solely for context of the current dispute. As the Court noted in its December 17, 2015 Order, TOA has only asserted a breach of contract claim under the 2011 Agreement, therefore, it cannot pursue any claim it might have based on the CM Modifications. (Doc. 79 at 6). With that said, "[u]nder the 2011 Agreement, Big E was obligated to "perform all repair, maintenance, and rebuilding services … that are necessary in order to properly maintain all tanker trailers in the [TOA] Fleet at all times in good operating condition." As such, "[t]o the extent that a faulty tank installation eventually led to other problems, such as, for example, frame cracking or excessive leaks, TOA [was] not necessarily precluded from asserting that Big E breached the 2011 Agreement by failing to perform the repairs, maintenance, or rebuilding needed to remedy those problems." (*Id.* at 8).

told Big E that it wanted changes made to the trailers with the CM Modifications; however, Ford disagreed that there was anything wrong with the trailers. (*Id.* at 147–148).

In an attempt to validate its concerns, TOA hired an engineer to "inspect, evaluate and recommend a remediation for structural [M]odifications made to the fleet of liquid fertilizer trailers." (Ex. 35, 35-002; Tr. 2 at 6–7). Ford did not wish to be present during the engineer's inspection of the trailers. (Ex. 75-059). She maintained that the CM Modifications did not cause any structural or safety issues. (*Id.*; Tr. 1 at 98; Tr. 2 at 122). Despite her difference of opinion, Ford told TOA that Big E would make changes to the crossmembers, but that Big E would need a diagram signed off by TOA and the list of trailers requiring such work. (Ex. 75-059).

During the week of December 9, 2013, Michael Thomas ("Thomas") visually inspected and photographed thirty-seven of TOA's trailers.[6] (Ex. 35, 35-002; 35-004). After his inspection, Thomas prepared a report to document his observations and conclusions. (*See* Ex. 35 (the "Report")). Among other things, Thomas reported that "the fleet was aged and showing multiple signs of corrosion, cracks and wear" and that (1) "structurally inappropriate repairs had been made to several [k]ing [p]in assemblies," and (2) the CM Modifications had "reduced the structural integrity" of some trailers. (*Id.* at 35-002–003). He recommended, *inter alia*, that TOA implement a "repair procedure for kingpins," and perform repairs to "[a]ll [a]ffected trailers with modified crossmembers." (*Id.* at 35-004–005). As a test case, Thomas suggested that TOA start with only two of the affected trailers, and to move forward from there depending on the results. (*Id.* at 35-004). In closing, Thomas emphasized that he had only performed a "limited visual assessment" of the trailers, and that he had performed "[n]o structural analysis . . . on any portion of these trailers

---

[6] Thomas's inspection included Hay's tanks and trailers from the Zellwood facility, which Big E was not obligated to service under the 2011 Agreement. (*See* Ex. 35, 35-002, 35-004).

to determine the load carrying capacity." (*Id.* at 35-005). Despite Thomas's disclaimer, and the fact that TOA knew it would need trailers for its impending busy season, it began taking several trailers out of service for changes to the crossmembers ("CM Changes").[7] (Tr. 1 at 218–219).

On or about December 13, 2013, representatives from TOA and Big E met in Lake Placid and decided that (1) kingpins would be repaired by Alex Garcia ("Garcia") (Big E's maintenance supervisor at the Lake Placid site); (2) Britt would provide Big E with signed engineered prints for the new configuration of the crossmembers; (3) Britt and Bruce would provide Big E with a list of affected trailers; and (4) upon receipt of the necessary information, Big E would provide a schedule for the work to be completed. (Ex. 75, 75-066, 75-008).

In late December, TOA instructed Big E to make CM Changes to trailer 189. (Doc. 92-2 at 169; Tr. 1 at 147–148). Before Big E began performing the work, Ford informed TOA that Big E would be billing at cost for the CM Changes. Specifically, on January 2, 2014, Ford told TOA that the CM Changes would cost TOA approximately $2,300, per trailer ($1,050 for materials and $1,250.00 for labor). (Doc. 33-001; Tr. 1 at 116–118; Doc. 92-2 at 161).

Big E began working on trailer 189 and completed the CM Changes on or about January 21, 2014. Upon receipt of trailer 189, Britt performed an inspection to ensure that the work was done to TOA's satisfaction. After the inspection, Britt informed his superiors that he believed they were "approaching their goal" and "headed in the right direction, and that trailer 189 needed only "a few minor adjustments." (Ex. 36, 36-001). On January 23, 2014, Cherry, Britt, Ford, and Garcia met once more and discussed the crossmembers. (Tr. 1 at 164). Despite the fact that Cherry had

---

[7] The Court uses the term "CM Changes" to refer to the re-working of the crossmembers requested by TOA.

received Thomas's Report on January 21, 2014, he did not provide Big E with a copy during the meeting. (Tr. 1 at 120).

On January 27, 2014, Ford sent TOA an email, stating, among other things, that she appreciated any criticism that would help her improve her service, and that she cannot fix what "she doesn't know is broke[n]." (Ex. 75, 75-074). To that end, Ford informed TOA that she was still waiting for the list of other trailers needing changes to the crossmembers. (*Id.* at 75-074). In response to her email, Cherry sent Ford a list of five red-tagged trailers[8] that needed "immediate" CM Changes.[9] (*Id.* at 75-076; Tr. 1. 149–150).

Less than two weeks after TOA decided to take several trailers out of service for CM Changes, Bruce emailed Big E, stating that "[TOA's] season [was] off and running and [TOA] need[ed] trailers." (Ex. 38, 38-001). In response, Ford informed Bruce that Big E had completed CM Changes to trailer 188, and as soon as Britt approved the repairs, it would start on the next two trailers. (Ex. 75, 75-085). Ford also reiterated that Big E would be billing at cost. (*Id.*). Cherry requested that Ford provide an estimate for the CM Changes. (*Id.* at 75-084). Accordingly, Ford sent Cherry a copy of an invoice outlining the cost factors for labor and materials. (Tr. 1 at 75-084; Tr. 1 at 98).

Although Ford made it abundantly clear that TOA would be responsible for the cost of labor and materials for work done to the crossmembers, upon receipt of Ford's invoice, Cherry responded:

> [T]he engineer[] . . . has determined that the trailers no longer have the structural strength required. Since this is a result [of the CM Modifications] to fit your tank design, all of the repairs, including

---

[8] Trailers 121, 191, AL-9, AL-120, and AL-129.

[9] Although TOA claimed that trailers 121 and 129 needed "immediate" CM Changes, TOA did not send these trailers to a third-party for said repairs until July 2014 and August 2014, respectively. (Ex. 75, 75-078–082).

> materials should be the responsibility of Big E, however due to the
> need to get these trailers back into service, we are willing to pay for
> the materials. I hope this can be resolved, so that we can maintain a
> good working relationship moving forward.

(Ex. 75, 75-084). In response, Ford told Cherry that she was "still waiting for a copy of the [R]eport," and maintained that Big E would not bear the cost of the CM Changes. (Ex. 75, 75-088). To that end, Big E invoiced TOA for the work done to trailers 189 and 188; however, TOA did not tender payment. (Tr. 1 at 64).

On February 10, 2014, Plank told Hodges that he wanted to give Big E a copy of the Report or any other documentation "stating how [and] why the Big E [CM Modifications] were not sufficient" because TOA "may be losing legal arguments for collecting damages from Big E by refusing to timely show them credible evidence that their cross member [*sic*] [M]odifications [were] not sufficient." (75, 75-090). In addition, Plank cautioned Hodges that "if [TOA] broke [its] contract with Big E and pursued other parties to make the repairs to the crossmember [Modifications], the expenses [would] be great." (*Id.*).

That same day, Bruce sent Big E an email claiming that TOA was "short trailers." (*Id.* at 75-092). Bruce also requested that Big E send a serviceman to perform fiberglass repairs on five trailers at the Lake Placid site. (*Id.*). Ford informed Bruce that Big E could not perform fiberglass repairs on the Lake Placid yard due to safety reasons. (Ex. 45, 45-001). However, she provided Bruce with tentative dates of completion for the five trailers needing repairs,[10] and inquired why TOA had not picked up trailer AL-14 if was actually short trailers.[11] (*Id.*).

---

[10] The email provided that 262 would be ready Thursday evening, 111 would be ready Saturday evening, 127 was in line for general repair, and A20 and 129 were both in line for crossmembers.

[11] Big E informed TOA that trailer AL-14 was ready for pick-up several days before Bruce sent an email claiming to be short on trailers.

In mid-February, Cherry finally provided Ford with a copy of the Report, but did not give her copies of the photographs taken by Thomas.[12] (Ex. 75, 75-095; Tr. 2 at 156, 175–177). After reviewing the Report, Ford sent Hodges an email contesting Thomas's opinion that the structural integrity of the trailers had been compromised by the CM Modifications. (Ex. 75, 75-095). Among other things, Ford emphasized that the Thomas had performed "no actual tests proving weakness or instability of the frame" and that the trailers had "never received a DOT violation or suffered a failure." (*Id.* at 75-095). Therefore, Ford reaffirmed her position that Big E would not "absorb the cost" for the CM Changes. (Ex. 75, 75-095).

## V.   COLLAPSE OF THE AGREEMENT

Two days after Ford rebuffed TOA's demand that Big E perform the CM Changes at its expense, Bruce sent Big E a message claiming that TOA had "[ten] trailers . . . out of commission that [were] not cross member [*sic*] related." (Ex. 53, 53-003). Ford advised Bruce that Big E only had five trailers[13] on the Bartow yard and asked for a list of the ten trailers TOA had at the Lake Placid site. (*Id.* at 53-002–53-003). In response, Bruce provided a list of only four trailers that were at Lake Placid, and two that TOA had sent to an outside contractor for kingpin repairs.[14] (*Id.* at 53-002).

In an effort to address TOA's complaints, Ford spoke with Cherry and "discussed a plan for processing trailers in a timely fashion." (*Id.* at 53-001; Tr. 2 at 142–143). Ford also requested that Bruce assign someone who could e-mail or fax her a copy of trailers needing repairs.

---

[12] Although Cherry claims that he provided Ford with a copy of the photos, the Court found Ford's testimony more credible.

[13] Trailers 207, 185, AL-11, 34, and 127.

[14] Trailers 35, 142, 83, and AL 17 were on the Lake Placid site. Trailers 210 and AL-2 had been sent to an outside contractor.

(Ex. 53, 53-001). Ford also advised that Big E had a trailer ready for pick up, and that it anticipated completing repairs on four other trailers in the upcoming week.[15] (*Id.*; Ex. 75-107).

In accordance with Ford's suggestion, on March 6, 2014, Milton Crenshaw ("Crenshaw), a TOA dispatcher, emailed Big E a list of trailers needing repairs. (Ex. 55, 55-001). Crenshaw advised Big E that TOA had three trailers that needed CM Changes and another three that needed general repairs.[16] (*Id.*). In reply, Ford informed Crenshaw that TOA and Big E were still trying to resolve the crossmember dispute and that she wanted to meet with Cherry, Bruce, and Britt the following week. (*Id.*) Ford also asked Crenshaw to hold two of the trailers necessitating general repairs until Big E could swap one back, since TOA claimed to be short on trailers. (Ex. 55, 55-001; Tr. 1 at 183). Ford stated that Big E would be completing repairs on three trailers in the upcoming week.[17]

By mid-March, Big E had completed CM Changes to at least four of TOA's trailers, but TOA still refused to pay for the work done. (Tr. 1 at 64; Tr. 2 at 134). In addition to performing CM Changes, Big E had also serviced several trailers at its Bartow and at TOA's Lake Placid site. (Ex. 75-111). Some of the repairs were completed a few days later than Big E anticipated, but there

---

[15] Ford provided the following list:
      207 - Ready for pick up
      185 - install new crossmember (Tues 3/4)
      34 - 5th wheel, repair tanks (Est. Wed 3/5)
      AL-11 - Repair Tanks (Est. Thurs 3/6)
      127 - Major tank repairs (Est. Mon 3/10).
[16] Trailers AL-3, 206, and 194 needed CM Changes. Trailers 191, 121, and 267 needed general repairs.
[17] Specifically, Ford stated that trailer A-11 would be ready on March 10, 2014, and that trailers AL-9 and 34 would be reading on March 13, 2014 and March 14, 2014, respectively (Ex. 55 at 55-001–55-008).

is no evidence that Big E missed any deadline imposed by TOA.[18] (Tr. 2 at 197–198; Tr. 1 at 184–185).

On March 12, 2014, Ford sent Hodges a letter inquiring about TOA's "sudden dissatisfaction of the service [Big E] perform[s]." (Ex. 75-101). By that time, however, Bruce and Britt had already met several times to discuss whether TOA should terminate the 2011 Agreement (Ex. 59, 59-001). On or about March 13, 2014, Bruce messaged Hodges, stating, in pertinent part:

> [Ford] fails to recognize [TOA]'s concern and [Big E's] responsibility. My recommendation is that [TOA] separate from Big E. [TOA] cannot afford to pay for crossmembers replaced and maintain a contract with Big E. I strongly feel that the plan that we put together will be very efficient and a rewarding plan.

(Tr. 1 at 102). Completely unaware of TOA's impending termination of the Agreement, Ford continued sending Hodges correspondence in an attempt to discuss and resolve issues relating to crossmembers. (Ex. 75, 75-105). In addition, Ford emailed Bruce to inform him that employees of TOA were placing trailers on the Bartow yard with inaccurate repair information,[19] or with no information at all. (*Id.* at 75-107).

On April 3, 2014, Young informed Cherry that Big E had five trailers on the Bartow yard, and that she would provide him with a schedule as soon as possible. (Ex. 60, 60-001). In response, Cherry said that TOA needed to get the trailers back on the road, and wanted to know which trailers Big E could repair quickly. (Ex. 60, 60-001). Young provided Cherry with a description of the

---

[18] During trail, TOA emphasized the fact that Big E did not complete repairs to trailer AL-9 until two weeks after its anticipated completion date. (Tr. 1 at 185; Tr. 2 at 197–198). However, trailer AL-9 was sent to Big E for CM Changes, not general repairs under the 2011 Agreement. (*See* Ex. 37-001).

[19] For instance, TOA dropped off trailer 207 and claimed that it had leaks, but after inspecting the trailer for weeks, Big E found no leaks. (Ex. 75, 75-107). Big E returned the trailer to TOA in February 2014, but TOA sent it back in March, under the same circumstances. TOA admitted its error, and advised Big E that trailer 207 had a problem with the baffles, not leaks. (*Id.*).

repairs needed on the five trailers. (Ex. 61, 61-001).  She also informed Cherry that Ford had tried to contact him and was awaiting his call. (*Id.*).

On April 7, 2014, TOA removed five trailers[20] off the Bartow yard, without providing notice to Big E. (Tr. 1 at 66; Tr. 2 at 132). Consequently, Big E was left with no trailers to service in Bartow. On April 29, 2014, Cherry told Ford that TOA was terminating the 2011 Agreement. (Tr. 1 at 139; Ex. 75, 75-109, 75-111).  Shortly thereafter, TOA told Garcia not to return to the Lake Placid site, as it would have no work for him. (Tr. 2 at 154). In accordance with the 2011 Agreement, Big E issued TOA an invoice for May 2014. However, TOA refused to make payment. (*Id.* at 150; Ex. 69, 69-001).

**CONCLUSIONS OF LAW[21]**

## I.    BREACH OF CONTRACT

The parties agree, that the laws of Florida govern this dispute. In Florida, to prevail on a claim for breach of contract, a party must prove by the preponderance of the evidence: (1) the existence of a contract, (2) a material breach of the contract, and (3) damages resulting from the breach. *Knowles v. C.I.T. Corp.*, 346 So.2d 1042, 1043 (Fla. 1st DCA 1977). The parties agree that the 2011 Agreement constituted a valid contract. The only issue is whether either party materially breached the 2011 Agreement, and if so, the resulting damages.

To constitute a material breach, a party's nonperformance must "go to the essence of the

---

[20] 127, 138, 267, AL-71 and 207. (Ex. 62). Witnesses from both parties testified that it was not unusual to have five or more trailers on the yard at any given time. (Tr. 1 at 68, 155). Moreover, the evidence reveals that trailers 138 and 207 were on the Bartow yard for eighteen days or less, (Ex.7, 7-006; Ex. 9, 9-006), and at least three of the trailers were sitting on the Bartow yard due to extenuating circumstances. For instance, two trailers were awaiting CM Changes, (Tr. 1 at 64, 66), trailer 207 sat on the yard due to TOA's mistake, (Ex. 75, 75-107), and trailer 127 was on the yard for an extended period of time for extensive tank repairs. (Ex. 52, 52-001; Ex. 53, 53-001).

[21] To the extent that any of these conclusions represent findings of fact, the Court adopts them as such.

contract; it must be the type of breach that would discharge the injured party from further contractual duty on his part." *Beefy Trail, Inc. v. Beefy King Intern., Inc.*, 267 So.2d 853, 857 (Fla. 4th DCA 1972). A party's "failure to perform some minor part of his contractual duty cannot be classified as a material or vital breach." *Id.*

## II.     TOA'S CLAIM

During trial, TOA spent an inordinate amount of time presenting evidence related to events falling outside the purview of the 2011 Agreement. Indeed, a considerable amount of TOA's evidence relates to the CM Modifications that occurred under the 2007 Agreement, and the parties' negotiations regarding changes to the crossmembers. TOA spent far less time providing the Court with specific details regarding Big E's alleged failure to perform under the 2011 Agreement. Nevertheless, TOA argues it has presented sufficient evidence demonstrating that Big E breached the 2011 Agreement by failing to provide TOA with copies of Big E's maintenance records, and by failing to perform Services required under the 2011 Agreement. (Doc. 109).

### A.     Maintenance Records

TOA claims that Big E violated the 2011 Agreement by refusing to provide TOA with maintenance records for its trailers. TOA claim lacks merit. First, the language of 2011 Agreement does not require Big E to provide TOA with maintenance records. Second, contrary to TOA's argument, Big E did not assume this obligation through the parties' prior course of dealings. Big E has never provided TOA with every maintenance record related to the trailers. Occasionally, Big E provided TOA with copies of maintenance records for a single trailer, however, the trial record is devoid of evidence showing that Big E provided maintenance files to TOA's fleet on a regularly or even frequent basis. Third, Ford never denied TOA access to the maintenance records or prohibited TOA from copying the records, (Tr. 1 at 152–153); she was simply unwilling to make

copies of these records at Big E's expense, (Tr. 2 at 159). Therefore, TOA has provided the Court

with no credible evidence showing that Big E breached the 2011 Agreement with regard to the

maintenance records.

**B.      Big E's Performance of Services under the Agreement**

TOA claims that, in July 2013, Big E's services began to decline with respect to quality

and timeliness, and continued to decline in 2014. (Tr. 1 at 89).

The evidence does not support this claim. The only service issue that arose in July 2013,

concerned TOA's alleged discovery that Big E had made CM Modifications to its trailers when

installing fiberglass tanks under the 2007 Agreement. As the Court explained prior to trial, TOA

only brings a claim against Big E for breach of the 2011 Agreement. TOA cannot, therefore, pursue

any claim or receive damages for the CM Modifications made by Big E under the 2007 Agreement.

(*See* Doc. 79 at 6; Tr. 1 at 7).

*1.      The Timeliness of Big E's Services*

To prove that Big E failed to repair trailers in a timely fashion, TOA points to isolated

instances when Big E did not provide TOA with a repair schedule, or provided TOA with a repair

schedule, but failed to meet some of its estimated dates of completion. (Doc. 109 at 15–20). The

Court is unpersuaded by both arguments.

The 2011 Agreement did not require Big E to provide TOA with a repair schedule.

Therefore, the mere fact that Big E did not consistently provide TOA with a repair schedule is of

no consequence. Additionally, TOA has not offered any evidence demonstrating that Big E's

failure to meet some of its self-imposed deadlines was unreasonable under the circumstances.

A mere deviation or decline in Big E's repair time would not constitute a material breach

unless it fell below industry standards or the reasonable expectation of the parties. There is no

provision in the 2011 Agreement requiring Big E to make repairs by a fixed period of time. And, TOA did not impose any repair deadlines that Big E failed to meet. Most importantly, the record is devoid of any expert testimony or industry standards regarding the length of time that Big E should have taken to complete repairs to TOA's trailers. Without a standard by which to compare the timeliness of Big E's services, it would be wholly speculative for the Court to infer that Big E's services were untimely. Simply put, there is no credible evidence demonstrating that the timeliness of Big E's services declined in 2014.

### 2.    The Quality of Big E's Services

TOA makes several arguments in an attempt prove that Big E's quality of services declined in 2014. For instance, TOA asserts that after it received trailer 189 "[it] raised concerns regarding the quality of the repairs that [Big E] performed on the trailer and submitted a report to Big E concerning the issues that needed to be addressed," but that "Big E never addressed the issues." (Doc 109 at 15). In support of its argument, TOA refers to an email prepared by Britt on or about January 22nd, wherein he lists additional adjustments that needed to be made to the crossmembers on trailer 189. (*Id.*). TOA's argument lacks merit for multiple reasons.

First and foremost, trailer 189 was slated for CM Changes, not general repairs under the 2011 Agreement. Therefore, the work Big E performed on trailer 189 is immaterial to the instant dispute. Second, TOA grossly mischaracterizes the evidence, as Britt only sent his January 22nd email to TOA management, not Big E. (*See* Tr. 2 at 22; *see also* Ex. 36). In fact, several days later, Cherry emailed Big E regarding trailer 189, and simply advised that the trailer had been repaired and needed just "a few quick touch ups" that could "probably be done in Lake Placid." (Ex. 37-001). TOA presented no evidence that it specifically asked Big E to make additional repairs to trailer 189, or that Big E failed to do so. Third, TOA's assertion that Big E failed to perform quality

work on trailer 189 is entirely undermined by the fact that it expressed satisfaction with Big E's work (Ex. 36), and continued sending trailers to Big E for CM Changes, (Ex. 37-001).

TOA also asserts that Big E failed to perform services required under the 2011 Agreement when it refused to send a serviceman to the Lake Placid site to repair fiberglass tanks. (Ex. 45, 45-001). This argument is also without merit. The 2011 Agreement contains no provision requiring Big E to perform tank repairs at the Lake Placid site. Furthermore, Big E could not allow its serviceman to perform fiberglass tank repairs at the Lake Placid site for "safety reasons." (Ex. 45, 45-001). Big E needed a "confined-space permit" to allow its servicemen work inside the tanks at the Lake Placid site. (Tr.1 at 177, 190). Big E had no valid permit at the time of TOA's request, and TOA had previously advised Big E that it was not permitted to go into the tanks due to safety factors. (Tr. 2 at 135–136). Thus, Big E cannot be faulted for its refusal to allow its employee to work inside tanks at Lake Placid.

Next, TOA argues that Big E neglected to repair "cracks, weld failures in many of [its] trailers," and consequently violated the 2011 Agreement, as well as DOT regulations governing the operation of TOA's trailers.[22] (*Id.* at 11– 13). In support of its argument, TOA primarily relies on testimony from two witnesses: David Friddle ("Friddle"), the president of Trailer Rebuilders, Inc. which is currently doing repair work for TOA, (Tr. 2 at 70, 82); and Alfred Newberry, an expert TOA hired to inspect the various trailers in its fleet, (*id.* at 64). However, even when combined with the other evidence in this case, neither Newberry nor Friddle's testimony lends any credence to TOA's claim.

---

[22] TOA contends that Big E violated DOT regulations that prohibit cracks in any portion of a commercial vehicle's trailer frame. *See* 49 C.F.R. § 393.201(a).

In February 2014, Friddle inspected several trailers that Big E serviced during some unspecified time period. (Tr. 2 at 72–82). Friddle testified that while inspecting TOA's trailers, he observed torque arms, rusting, leaking tanks, and worn kingpins. (*Id.*). Friddle insinuated that Big E had "missed" these defects, which should have been repaired through preventative maintenance. (*Id.* at 78–79). However, when probed by opposing counsel, Friddle could not tell the Court how long it had been since Big E had the opportunity to inspect the trailers he examined. (*Id.* at 82–83). Friddle simply responded, that the time "varied." (*Id.* at 83). He knew only that one trailer had been inspected "six months" prior to his inspection on February 2014. (*Id.*).

Friddle's nebulous testimony does not establish that Big E missed defects in the trailers, or that it failed to repair such defects. To the contrary, his testimony corroborates Ford's unrefuted testimony that, sometimes it took several months before Big E had an opportunity to inspect and service trailers in the Fleet.

The Court found Newberry's testimony equally unbeneficial, as his testimony dealt almost exclusively with the Modifications to TOA's trailers. As stated above, TOA commissioned Newberry to inspect several of its trailers. (Tr. 2 at 39). Therefore, in January and June 2015, Newberry came to Florida and visually inspected eleven of TOA's trailers. (Tr. 2 at 39). However, Newberry only performed a structural analysis on a single trailer that he believed to be representative of the condition of the other trailers. (*Id.* at 41–42). After conducting this questionable analysis, Newberry rendered several opinions regarding the trailers he physically inspected.[23] Notably, however, he rendered no opinion regarding the condition of TOA's trailers

---

[23] Newberry opined that the cracks and leaks he observed on the trailers in 2015 were the result of the CM Modifications made by Big E under the 2007 Agreement. He also opined that the trailers were (1) not in good working condition, (2) did not met the industry standard for trailers in the tanker trailer maintenance industry, and (3) did not meet DOT standards because they contained cracks. (*Id.* at 57–59).

at the time Big E was obligated to service them.[24] Consequently, Newberry's testimony fails to substantiate TOA's claim that Big E failed to repair defects in its trailers, or that Big E was even aware of such defects.[25]

TOA claims that Big E knew that many of its trailers contained "cracks, corrosion, and failed welds" because Big E was "put on notice by TOA and by the [] Report." (Doc. 109 at 11). However, there is no evidence showing that TOA informed Big E of these defects. In fact, after examining the entire record, the Court did not find a single piece of correspondence informing Big E of the alleged defects about which TOA now complains. Rather, most of the correspondence relates primarily to the CM Modifications and Changes to TOA's trailers. For example, Cherry's email to Ford (Ex. 75, 75-084), Plank's email to Hodges (*id.* at 75-090), and Bruce's message to Hodges (Tr. 1 at 102), clearly show that TOA was not concerned with Big E's performance under the 2011 Agreement. Rather, TOA desired to pressure Big E into making CM Changes to its trailers at Big E's expense. Therefore, the Court views TOA's complaints regarding Big E's service as pretext for terminating the 2011 Agreement.

It is also disingenuous for TOA to claim that Big E was on notice of the need to repair cracks, leaks, and corrosion based on information contained in Thomas's Report. TOA received a copy of the Report on January 21, 2014, but did not give Ford a copy until mid-February. Moreover, TOA only gave Ford a copy of the Report once she continued to rebuff TOA's demand

---

[24] Even if Newberry had offered an opinion regarding the condition of the trailers in 2014, the Court would have not been inclined to give his opinion much weight. As Newberry himself said, viewing trailers in person is "absolutely essential" before rendering an opinion. (Tr. 2 at 39–41).

[25] Newberry and Friddle also testified it "appeared that someone" attempted to repair a leak in a tank by pouring pure resin on the floor. (Tr. 2 at 52, 78). However, neither individual claimed that Big E had made this repair. Moreover, Ford credibly testified that Big E does not repair leaks by pouring resin on top of it, and that if resin was observed on the floor of a tank was simply a spill that was not cleaned up. (Tr. 2 at 155–156).

that Big E absorb a portion of the cost for the CM Changes. (Ex. 75, 75-088, 090). When TOA did eventually give Ford a copy of the Report, it failed to furnish copies of the photographs that purportedly depicted cracks and corrosion on the trailers.[26] Thus, the Court concludes that Big E had no notice of the defects that TOA contends it failed to repair. If Big E had been given notice, the Court finds that it would have repaired them, as it has done for many years on other occasions. (*See e.g.* Ex. 3, 3-005–003-021; Ex. 5, 5-007–009).

Having found that Big E did not have notice of the cracks allegedly depicted in Thomas's Report, the Court rejects TOA's argument that Big E violated breached the 2011 Agreement by failing to comply with DOT regulation 49 C.F.R. § 393.201(a). Furthermore, it does not appear that any of TOA's trailers had ever been found to be non-compliant with DOT regulations.[27]

Finally, TOA asserts that if often had to redo "kingpin[28] and other general service repairs." (Doc. 109 at 16). In support of this assertion, TOA relies on the testimony of Britt and Bruce. (*Id.* at 16). However, Britt and Bruce offered nothing more than vague testimony concerning instances where TOA allegedly received trailers back from Big E and needed to fix "different little areas." (Tr. 2 at 15–16; 30). Neither witness offered any credible testimony from which the Court could

---

[26] TOA argues even if Big E did not receive the photographs, the Report still put Big E on notice of its need "to repair the problems being caused by the crossmembers [M]odifications." (Doc. 109). This argument is flawed. Although Thomas noted the "the fleet was aged and showing multiple signs of corrosion, cracks and wear," "rusting," and inappropriate repairs to kingpin assemblies, Thomas did not specify which trailers contained these defects. The undisputed evidence reflects that Thomas inspected several trailers that Big E did not have an obligation to service under the 2011 Agreement. More importantly, the record does not support the claim that TOA sent Big E the trailers containing the alleged defects noted in the Report, or that Big E refused to repair them.

[27] Bruce, Smith, Hodges, and Moore all testified that none of the trailers serviced by Big E had ever received a DOT sanction. (Tr. 1 at 98, 223; Tr. 2 at 95, 121–122).

[28] TOA presented no credible evidence that Big E's services declined with respect kingpin repair. Each time TOA requested that Big E make repairs to the kingpins, Big E complied. The undisputed evidence shows that in 2014, TOA believed Garcia was doing "very nice work on quality repairs to the fifth/wheel kingpin plates." (Ex. 36).

reasonably conclude that Big E performed inadequate kingpin or other general service repairs. Consequently, TOA has failed to prove that Big E's quality of service declined, or that it failed to perform its obligations under the 2011 Agreement.

After combing through a mountain of exhibits and trial testimony, the Court concludes that Big E's performance under the 2011 Agreement was not materially deficient. Rather, TOA's dissatisfaction with Big E, and the apparent motivation for its termination of the 2011 Agreement, was Big E's refusal to absorb the expense of the CM Changes. However, this was not a legitimate reason to terminate the 2011 Agreement, as Big E had not breached any provision of the contract.

## III.    BIG E'S CLAIM

Big E claims that TOA breached the 2011 Agreement when it failed to render payment for the month of May 2014, and thereafter, in accordance with the terms of the contract. While TOA spends much time attempting to justify terminating the 2011 Agreement, it does not deny that it refused to continue paying Big E. In fact, it does not address the issue at all. Having found that Big E did not materially breach the 2011 Agreement, the Court concludes that TOA breached the Agreement, and that Big E is entitled to recoup damages.

## IV.     DAMAGES

In a breach of contract action, the innocent party is entitled to recover any losses sustained, including the loss of prospective profits. *Adams v. Dreyfus Interstate Devel. Corp.,* 352 So.2d 76 (Fla. 4th DCA 1977). Prospective profits must be proven with reasonable certainty. *Id.* However, as noted in *Sampley Enterprises, Inc. v. Laurilla,* 404 So.2d 841, 842 (Fla. 5th DCA 1981), it is sufficient "if there is a reasonable basis in the evidence for computation of damages, although the result may be only approximate." "Proof of lost profits is generally derived from proof of income

[less] expenses for a reasonable period of time prior to the breach." *Born v. Goldstein*, 450 So.2d 262, 264 (Fla. 5th DCA 1984).

Ford, the principal owner of Big E, testified that Big E suffered a lost profit of approximately $268,514.66, due to TOA's breach. Ford arrived at this figure by taking the amount Big E expected to gain under the Agreement, $591,175.00 (107 trailers @ $325.00 each, multiplied by the 17 months remaining under the Agreement), and reducing it by Big E's anticipated expenses, $322,000. (*See generally* Tr. 1 at 41–60). The approximate amount of Big E's expenses was determined by reviewing the amount Big E expended on materials, labor, and overhead, from October 2013 through April 2014. (*Id.*).

TOA attempted to challenge Ford's calculation of Big E's lost profits; however, it failed to show that Ford's method was flawed, or that an examination of Big E's expenses during a different time frame would lead to a substantially different result. (*Id.*). In light of the evidence presented, the Court finds that Big E has established, by a preponderance of the evidence, that it suffered lost profits in the amount of **$268,514.66**.

In addition to the lost profits, Big E seeks interest accruing from the date of TOA's breach up until the date of judgment. Under Florida law, where there is no contract rate establishing the appropriate interest rate, the interest rate is set annually by the Chief Financial Officer. *See* Fla. Stat. §§ 687.01 and 55.03. From October 1, 2011 up until May 31, 2016, the applicable legal interest rate was 4.75% per annum,[29] and increased to 4.78% on April 1, 2016.[30] As mentioned above, the Agreement was set to expire on October 2015. However, TOA breached the Agreement

---

[29] *See* Florida Department of Financial Services, Historical Judgment Interest Rates, available at http://www.myfloridacfo.com/division/AA/Vendors/JudgmentInterestRates.htm (last accessed May 9, 2016).

[30] *See* Florida Department of Financial Services, Judgment Interest Rates, available at http://www.myfloridacfo.com/division/AA/Vendors/ (last accessed May 9, 2016).).

in May 2014, and Big E began incurring lost profit of $15,794.98 per month ($268,514.66 divided by the 17 months remaining under the Agreement). Therefore, as detailed below, Big E is entitled to prejudgment interest on its losses under the 2011 Agreement in the amount of **$9,565.76**.

| Unpaid Months | Monthly Payments | Monthly Interest X .39583333% (4.75%/12) | Total Interest |
|---|---|---|---|
| 1 MAY     2014 | $15,794.98 | $62.52 | $62.52 |
| 2 JUNE | $31,589.96 | $125.04 | $187.56 |
| 3 JULY | $47,384.94 | $187.56 | $375.12 |
| 4 AUG | $63,179.92 | $250.09 | $625.21 |
| 5 SEPT | $78,974.90 | $312.61 | $937.82 |
| 6 OCT | $94,769.88 | $375.13 | $1,312.95 |
| 7 NOV | $110,564.86 | $437.65 | $1,750.60 |
| 8 DEC | $126,359.84 | $500.17 | $2,250.77 |
| 9   JAN     2015 | $142,154.82 | $562.69 | $2,813.46 |
| 10 FEB | $157,949.80 | $625.21 | $3,438.67 |
| 11 MAR | $173,744.78 | $687.73 | $4,126.40 |
| 12 APR | $189,539.76 | $750.26 | $4,876.66 |
| 13 MAY | $205,334.74 | $812.78 | $5,689.44 |
| 14 JUNE | $221,129.72 | $875.30 | $6,564.74 |
| 15 JULY | $236,924.70 | $937.82 | $7,502.56 |
| 16 AUG | $252,719.68 | $1000.34 | $8,502.90 |
| **17 SEPT** | **$268,514.66** | **$1,062.86** | **$9,565.76** |

In addition, the Court calculates prejudgment interest on Big E's lost profits after the 2011 Agreement as follows:

October 1, 2015 through December 31, 2015.
$268,514.66 x .0130137% (daily interest rate) x 92 days = $3,214.82
January 1, 2016 through March 31, 2016
$268,514.66 x .0129781% (daily interest rate) x 91 Days = $3,171.18
April 1, 2016 until the date of judgment
$268,514.66 x .0130624% (daily interest rate) x 48 days =  $1,683.57
Total    $8,069.57

Therefore, the aggregate of damages against TOA is **$286,149.99**.

## CONCLUSION

In consideration of the foregoing, it is **ORDERED AND ADJUDGED** that the Clerk enter Judgment in favor of the Plaintiff/Counter Defendant, Big E Trailers, Inc., and against the

Defendant/Counter Claimant, The Ohio Andersons, Inc., in the amount of $286,149.99. The Court

will retain jurisdiction to determine issues of attorney's fees and costs. The Clerk is **ORDERED**

to close the case.

      **DONE** and **ORDERED** in Chambers, Orlando, Florida on May 20, 2016.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE